# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-03183-RM-NYW

HEARTLAND BIOGAS, LLC,

     Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF WELD COUNTY, THE,
DAVID KREUTZER,
HEATHER BARBARE,
MICHAEL BANKOFF, and
DONALD SNAPP,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

This matter is before the court on two pending motions:

(1)    Defendant Board of County Commissioners of Weld County's (the "Board") Motion to Dismiss the Seconded Amended Complaint and Jury Demand (the "Motion to Dismiss), [#73, filed May 16, 2017]; and

(2)    Defendants David Kreutzer, Heather Barbare, Michael Bankoff, and Donald Snapp's (collectively, "Individual Defendants") Motion to Dismiss, [#90, filed June 30, 2017].

The undersigned considers the pending motions pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated January 17, 2017 [#31], and the Memoranda dated May 17, 2017 [#75] and June 30, 2017 [#92]. Upon review of the Motions and related briefing, the entire case file, the applicable case law, and the comments offered at the August 8, 2017 Motions Hearing, this court respectfully RECOMMENDS that the Board's Motions to Dismiss be GRANTED IN

PART and DENIED IN PART, and that the Individual Defendants' Motion to Dismiss be GRANTED.

## BACKGROUND

Plaintiff Heartland Biogas, LLC ("Plaintiff" or "Heartland"), a Delaware limited liability company with its principal place of business in San Diego County, California,[1] owns and operated a "4,700 MMBtu/day renewable natural gas facility that is roughly equivalent to a 20MW electric plant (the "Facility"), [] located in part of the SE 1/4 of Section 25, Township 4 North, Range 65 West of the 6th P.M. in Weld County, Colorado." [#64 at ¶ 18]. "The Facility used an anaerobic digester system to convert cow manure, food waste, and other organic waste from local sources into renewable natural gas. After the natural gas was cleaned and compressed, it was injected into the Colorado Interstate Gas Company Pipeline." [*Id.* at ¶19]. The Facility's anaerobic digester also generated Liquid Soil Amendment ("LSA"), a fertilizer substitute, used by local farms, and compost, distributed by local businesses. [*Id.* at ¶¶ 2, 19]. Heartland contends that the Facility had positive effects on the environment by reducing greenhouse gas emissions and decreasing the amount of waste in landfills, and that it had positive impacts in the community. *See* [*id.* at ¶¶ 19–21].

In early 2009, Heartland's predecessor-in-interest, Heartland Renewable Energy, LLC ("Heartland Renewable"), began obtaining the necessary state and local permits and approvals to construct the Facility, submitting an application for a Certificate of Designation ("CD") for the proposed facility to Weld County as well as to the Colorado Department of Public Health and Environment ("CDPHE"). [*Id.* at ¶¶ 22–23]. The CDPHE recommended that the Board approve the CD in accordance with Colorado's Solid Waste Regulations, 6 Colo. Code Regs. § 1007–

---

[1] Heartland's sole member is EDF Renewable Development, Inc., a Delaware corporation with its principal place of business in San Diego, California. [#1 at ¶ 6].

2:1.6. [*Id.* at ¶ 24]. On July 21, 2010, the Board issued a resolution approving the application for a Use by Special Review Permit ("USR-1704") in addition to Heartland Renewable's CD, but conditioned both on the preparation and the recordation of a plat for the Facility. [*Id.* at ¶¶ 25–26].

On May 1, 2013, the Board issued a Resolution approving a request to modify the original CD to reflect significant changes to the proposed layout of the Facility. [*Id.* at ¶ 27]. Around this same time, Heartland Renewable engaged in several discussions with the CDPHE and the Colorado Department of Agriculture ("CDA") regarding the Facility's production of "digestate liquor," a liquid containing various nutrients and minerals that could be beneficial to crop growth. [*Id.* at ¶¶ 28–29]. Allegedly, Heartland Renewable, the CDPHE, and the CDA reached an agreement whereby Heartland Renewable could freely market its digestate liquor as LSA, so long as it complied with the CDA's rules and regulations concerning the testing and labeling of the digestate liquor. *See* [*id.* at ¶¶ 30–38, 40–42]. The CDA eventually issued to Heartland Renewable (later issued and re-issued to Plaintiff) Energy Certificate of Registration 9931 for "Digestate Liquor," and approved Plaintiff's LSA labels. *See* [*id.* at ¶¶ 38–39, 41]. Plaintiff alleges that the CDA and CDPHE continually affirmed that it could distribute its digestate liquor as LSA, not as a regulated solid waste, and, thus, Plaintiff proceeded with the Facility's development in reliance on these affirmations. [*Id.* at ¶¶ 40, 42–43].

Between August and December 2013, Heartland Renewable transferred its ownership of the Facility to Plaintiff, and the Board and the CDPHE allegedly recognized Plaintiff as the owner and operator of the Facility for purposes of the CD and USR-1704. [*Id.* at ¶¶ 44–49]. Specifically, on December 19, 2013, the Board issued a resolution approving an Improvements Agreement (that the Board later entered with Heartland) and accepted collateral for USR-1704

from Heartland—the resolution also recognized Plaintiff as Heartland Renewable's successor. [*Id.* at ¶ 50]. Then, in January 2014, the Board approved the plat for USR-1704, and issued Heartland a building permit for the Facility on March 31, 2014. [*Id.* at ¶¶ 51–53]. The Weld County Planning Director also approved Heartland's request for a "Minor Amendment to the Site Specific Development Plan MUSR 14-0030," and, because Plaintiff believed it had the requisite assurances to continue development of the Facility from the Board, CDPHE, and CDA, it constructed the Facility and distributed LSA to local farmers for the 2016 growing season. [*Id.* at ¶¶ 54–61].

However, on about April 27, 2016, during the Facility's incipiency, a Weld County inspector reported that the Facility emitted odor exceeding the "7:1 dilution standard for odor under the Special Review Permit." [*Id.* at ¶¶ 62–63]. Heartland allegedly undertook extensive measures to mitigate the odor issues, but nevertheless received a compliance advisory from the Air Pollution Control Division ("APCD") of the CDPHE on June 30, 2016. [*Id.* at ¶¶ 64–66]. Because of this odor violation, the Board held a probable cause hearing on July 11, 2016, to determine whether it had sufficient evidence to proceed with a show cause hearing regarding the April 2016 odor violation. [*Id.* at ¶ 67]. At the July 2016 probable cause hearing, Plaintiff alleges that the Board received testimony from the Department of Planning Services that the April 2016 violation was the only recorded odor violation, and that it was an abnormal weather day the day the inspector recorded the violation, "resulting in an abnormally high odor." [*Id.* at ¶¶ 68–69]. Nonetheless, the Board concluded that it had sufficient evidence to hold a show cause hearing regarding this sole violation. [*Id.* at ¶¶ 70–71]. From here, Heartland's relationship with the Board and the CDPHE began to deteriorate.

For example, Heartland alleges that it began experiencing issues relating to its distribution of LSA. Specifically, on September 8, 2016, Defendant Barbare emailed Heartland and informed it that its LSA was now considered a solid waste that required a discharge permit before Heartland could distribute it to third parties. [*Id.* at ¶ 72]. Plaintiff alleges that Defendant Barbare's email constituted the first change in the CDPHE's position in the three years since the CDA approved Heartland's distribution of LSA. [*Id.* at ¶¶ 72–73]. Similarly, Defendants Bankoff and Snapp sent Plaintiff a letter informing it that the CDPHE now considered the LSA regulated solid waste, requiring CDPHE approval prior to its distribution. *See* [*id.* at ¶¶ 86–88].

As to the odor violation, the Board held a show cause hearing to determine whether it should revoke USR-1704 on September 19, 2016. [*Id.* at ¶ 74]. At this hearing, the Board received testimony from the Weld County inspector who relayed that no other violations had occurred since April 2016; however, several community members testified to odors emanating from the Facility. [*Id.*]. Ultimately, the Board continued the hearing until November 14, 2016, to allow Heartland to pursue further mitigation measures—Heartland alleges that it complied with this directive, as well as the Board's "unauthorized" conditions that the Facility limit its gas production to 60% of its design capacity, limit its receipt of organic materials, and that it conduct at least two community meetings. [*Id.* at ¶¶ 75–80].

Prior to the November 14, 2016 show cause hearing, Heartland voluntarily entered into a Compliance Order with the APCD to abate the odor issues. [*Id.* at ¶ 89]. Heartland agreed to invest approximately $3 million in odor mitigation, capture, and control systems. [*Id.* at ¶¶ 90–91]. Heartland then presented the Compliance Order to the Board at the November 14 show cause hearing, and informed the Board that it had until 2017 to attain its obligations under the order and, if it succeeded, the APCD would take no further action on the April 2016 odor

violation. [*Id.* at ¶¶ 93–95]. According to Heartland, the Board then offered a myriad of "new alleged violations . . . [that] would be sufficient reason to revoke or suspend Heartland's Special Use Permit," but did so without proper notice. [*Id.* at ¶¶ 97, 99]. For example, the Board identified an alleged violation that Heartland was operating the Facility without a valid CD, based on Defendant Kreutzer's November 8 letter that Heartland Renewable *did not* transfer the CD to Plaintiff. *See* [*id.* at ¶¶ 81–85, 98]. The Board also raised potential violations of USR-1704's Conditions and Development Standards related to nuisance control. *See* [*id.* at ¶ 99]. At the conclusion of the November 14 show cause hearing, the Board re-imposed its September 19 conditions on the Facility, and then issued a resolution concluding that it had sufficient evidence to hold a further show cause hearing on the newly identified violations, violations the Plaintiff alleges were based on public complaints, not factual evidence. *See* [*id.* at ¶¶ 100–01].

On December 19, 2016, the Board held another show cause hearing. [*Id.* at ¶ 110]. At this hearing, Heartland submitted evidence in support of its contention that no violation of USR-1704 had occurred and, to the extent any violation had occurred, revocation or suspension was unwarranted. [*Id.* at ¶ 111]. Heartland avers, however, that despite its evidence, the Board had already predetermined that it would suspend USR-1704, and then issued an oral decision indefinitely suspending USR-1704. *See* [*id.* at ¶¶ 112–120]. Plaintiff continues that the Board subjected it to "unprecedented enforcement efforts," including at least seven (7) inspections of the Facility, many of which were unannounced or preceded by little notice, and injected itself into Heartland's disputes with Defendants Barbare, Bankoff, and Snapp regarding its LSA distribution. *See* [*id.* at ¶¶ 102–09]. Plaintiff avers that the Board treated it differently than similarly situated entities. *See* [*id.* at ¶ 120].

Ultimately, on December 28, 2016, the Board issued a resolution indefinitely suspending USR-1704 pending resolution of the alleged violations, i.e., Heartland's lack of a proper CD and violations of USR-1704's conditions and standards. [*Id.* at ¶¶ 121–23]. Plaintiff avers that the resolution contains no discussion of the required mitigating factors applicable to the decision to suspend USR-1704, and is unsupported by law or fact. [*Id.* at ¶¶ 124–25]. Because of the enormous costs associated with suspending its operations, Heartland alleges that it began the winding down process for the Facility on January 28, 2017. *See* [*id.* at ¶¶ 127–131]. According to Heartland, the actions of the named Defendants have resulted in Plaintiff's loss of its $102 million investment in the Facility as well as its projected profits "over the next 18 years while its natural gas contract was in effect." [*Id.* at ¶¶ 132–34].

Accordingly, Plaintiff initiated this action by filing its initial Complaint against the Board, and Weld County Commissioners Barbara Kirkmeyer, Mike Freeman, Julie Cozad, Steve Moreno, and Sean Conway—each in their respective official capacities, on December 27, 2016. [#1]. Concomitantly, Plaintiff filed a Motion for Temporary Restraining Order ("TRO") against the Board, seeking to enjoin the suspension of USR-1704. [#2].

On December 28, 2016, Plaintiff filed an Amended Complaint as a matter of right under Rule 15 of the Federal Rules of Civil Procedure. [#13]. The First Amended Complaint ("FAC") asserted the following claims: (1) violation of Rule 106(a)(4) of the Colorado Rules of Civil Procedure; (2) Regulatory Taking; (3) violation of Plaintiff's Substantive Due Process rights; (4) violation of Plaintiff's Equal Protection rights; and (5) violation of Plaintiff's Procedural Due Process rights. [#13]. On December 30, 2016, the presiding judge, the Honorable Raymond P. Moore, denied the Motion for TRO as moot, but allowed Heartland to submit a renewed Motion

for TRO. [#18]. Following an evidentiary hearing, Judge Moore denied Plaintiff's renewed Motion for TRO on January 9, 2017. [#29].[2]

On February 1, 2017, the Board and Commissioners Kirkmeyer, Freeman, Cozad, Moreno, and Conway filed a partial Answer to the FAC's Rule 106(a)(4) claim and asserted a counterclaim against Plaintiff, seeking injunctive relief. *See* [#40]. Then, the Board and Commissioners Kirkmeyer, Freeman, Cozad, Moreno, and Conway filed their first Motion to Dismiss, seeking dismissal of the FAC's remaining claims. [#42].

The undersigned held a Scheduling Conference on March 7, 2017, setting the following relevant deadlines: (1) March 13, 2017 for submitting the Administrative Record regarding the Rule 106(a)(4) claim plus an associated briefing schedule; and, with respect to the remaining claims, (2) setting a discovery schedule, as well as April 21, 2017, as the deadline for joinder of parties and amendment of pleadings. *See* [#47]. On March 31, the Board and Commissioners Kirkmeyer, Freeman, Cozad, Moreno, and Conway filed their Motion for Protective Order Against All Discovery or in the Alternative Motion to Stay All Discovery Until After Resolution of Plaintiff's C.R.C.P. 106(a)(4) Claim ("Motion to Stay"). [#57]. However, on April 21, 2017, Plaintiff filed its Motion to Amend Complaint and Dismiss Rule 106(a)(4) Claim ("Motion to Amend"). [#62]. Judge Moore granted the Motion to Amend, and ordered Plaintiff to serve and file its Second Amended Complaint ("SAC") on or before May 3, 2017. [#63].

On May 2, 2017, Plaintiff filed its SAC, the operative complaint in this matter. [#64]. The SAC dismisses Plaintiff's Rule 106(a)(4) claim and dismisses as Defendants Commissioners Kirkmeyer, Freeman, Cozad, Moreno, and Conway and all official capacity claims against them. [*Id.*]. Instead, the SAC adds individual capacity claims against several employees of the

---

[2] Plaintiff also filed a Motion for Preliminary Injunction [#35], but later withdrew that motion as moot. *See* [#59].

CDPHE—Defendants Barbare, Bankoff, Snapp, and Kreutzer. *Compare* [#13] *with* [#64].[3] Accordingly, the operative claims in this matter include: (1) promissory estoppel against the Board regarding the CD and USR-1704 ("Claim I"); (2) Regulatory Taking against the Board ("Claim II"); (3) Substantive Due Process violations regarding the CD and USR-1704 against the Board and Defendant Kreutzer ("Claim III"); (4) Equal Protection violations against the Board ("Claim IV"); (5) Procedural Due Process violations against the Board and Defendant Kreutzer ("Claim V"); and (6) Substantive Due Process violations regarding the LSA against Defendants Barbare, Bankoff, and Snapp ("Claim VIII").

On May 16, 2017, the Board filed its Motion to Dismiss the SAC. [#73]. Then, on June 30, 2017, the Individual Defendants filed their Motion to Dismiss the SAC, and their Motion to Stay all discovery pending the court's resolution of their Motion to Dismiss. [#90; #91]. The undersigned then conducted a Telephonic Discovery Conference with the Parties on July 6, 2017. [#94]. At this Conference, this court granted in part and denied in part the two motions to stay discovery [#57; #91] and Heartland's Motion to Amend the Scheduling Order [#88]. *See* [#94]. Accordingly, the undersigned stayed all discovery in this matter until August 25, 2017, and set a Status Conference for September 7, 2017. [*Id.*].

On August 8, 2017, the undersigned held a Motions Hearing on the two pending Motions to Dismiss, and took the Motions under advisement. [#99]. The Motions are ripe for Recommendation, *see* [#83; #86; #95; #97], and this court considers the Parties' arguments below.

---

[3] The SAC also added the CDA and the CDPHE as Defendants; however, Heartland voluntarily dismissed both and its claims against them, i.e., Claim I as to the CDPHE only, Claim VI, and Claim VII, on June 19, 2017. [#84].

**LEGAL STANDARDS**

**I.      Rule 12(b)(1)**

Federal courts are courts of limited jurisdiction and, as such, "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction." *The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring).  Indeed, courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party.  *Image Software, Inc. v. Reynolds & Reynolds, Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may bring either a facial or factual attack on subject matter jurisdiction, and a court must dismiss a complaint if it lacks subject matter jurisdiction.  *See generally Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 n.4 (10th Cir. 2015).  For a facial attack, the court takes the allegations in the Complaint as true; however, when reviewing a factual attack, the court may not presume the truthfulness of the Complaint's factual allegations and may consider affidavits or other documents to resolve jurisdictional facts.  *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995).  The burden of establishing jurisdiction rests with the party asserting jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

**II.     Rule 12(b)(6)**

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120,

1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). However, the court may consider materials outside the complaint without converting a motion to dismiss to one for summary judgment if the documents are central to the plaintiff's claims, referred to in the complaint, and if the parties do not dispute their authenticity. *See Cty. of Santa Fe, N.M. v. Public Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002). Additionally, the court may take judicial notice of undisputed court documents and matters of public record. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n. 24 (10th Cir. 2006).[4]

In any case, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible."). The ultimate duty of the court is to "determine whether the complaint sufficiently

---

[4] Here, Heartland attaches seventeen (17) exhibits to the SAC, and references all in the SAC. *See* [#64-1 through #64-17]. At oral argument, the Parties urged and encouraged this court to consider *all* evidence of record, including the numerous exhibits appended to the Administrative Record, *see* [#49 through #53 and attached exhibits], in considering the pending Motions to Dismiss. *E.g.*, [#104 at 27:10–20 ("Mr. Hegarty said multiple times which was his encouragement view [sic] to look at the record and all the attachments. We highly encourage you to do that, Your Honor.")]. This court then sought clarification from the Parties as to whether the pending motions should be converted to motions for summary judgment pursuant to Rule 56. [*Id.* at 92:17–93:11]. The Parties each indicated that converting the motion to one for summary judgment was unnecessary, but that this court could and should consider the evidence attached to the SAC or contained within the record that may be relevant to the pending motions. *See* [#100; #101]. In hewing to the applicable case law, this court considers only those documents attached to or referenced in the SAC that are central to Plaintiff's claims and this court's analysis rather than engaging in a more general review of the evidentiary record at this stage.

alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Because the Board and the Individual Defendants both move for dismissal of Heartland's claims under Rules 12(b)(1) and 12(b)(6), this court turns first to Defendants' arguments implicating this court's subject matter jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682 (1946); *Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005) (holding that once a federal court determines that it is without subject matter jurisdiction, it must not proceed to consider any other issue). Then, to the extent this court concludes that subject matter jurisdiction exists, this court proceeds with an analysis of Defendants' arguments under Rule 12(b)(6).

## I.     Dismissal under Rule 12(b)(1)

### A.     The Board

The Board first moves for dismissal pursuant to Rule 12(b)(1) of Claims I, II, III, IV, and V, arguing that Heartland's promissory estoppel claim is barred by the Colorado Governmental Immunity Act ("CGIA"),[5] and that all of Plaintiff's federal constitutional claims are unripe for lack of a final agency action under *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 186 (1985).[6] This court considers the Board's arguments in turn.

---

[5] The Colorado Governmental Immunity Act bars actions in tort against public employees and entities, subject to certain provisions waiving immunity. *Medina v. State*, 35 P.3d 443, 453 (Colo. 2001). "Governmental immunity raises a jurisdictional issue." *Springer v. City & County of Denver,* 13 P.3d 794, 798 (Colo. 2000).

[6] Additionally, Plaintiff seeks monetary damages pursuant to § 1983 for Claims II-V, and VIII that are predicated on both the federal and Colorado Constitutions. However, as the Board correctly argues, there is no implied cause of action arising directly from the Colorado Constitution. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 81 F. Supp. 2d 1090, 1097 (D. Colo. 2000). Section 1983 provides the adequate relief Plaintiff seeks under the federal

### 1. Claim I – Promissory Estoppel

Under Colorado law, "[t]he elements of a promissory estoppel claim are: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promise; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). "The promise must be clear and unambiguous. . . . It also must be sufficiently definite to allow a court to understand the nature of the obligation." *Peace v. Parascript Mgmt., Inc.*, 59 F. Supp. 3d 1020, 1029 (D. Colo. 2014) (internal quotations and citations omitted).

Here, the Board moves to dismiss Claim I, because Heartland's promissory estoppel claim "is really an alleged negligent or intentional misrepresentation of fact, it is or could be a tort and the CGIA precludes it." [#73 at 14]; *see also* [#86 at 14–15]. Because this court agrees with the Board's first argument, it focuses on it and does not consider the Board's alternate argument that Heartland fails to allege an actionable promise made by the Board. *See* [#73 at 14–15].

The CGIA provides that a "public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort." Colo. Rev. Stat. § 24–10–106(1). Whether an action lies or could lie in tort "depends on the factual basis underlying the claim and, specifically, the nature of the alleged injury." *First Nat'l Bank of Durango v. Lyons*, 349 P.3d 1161, 1164 (Colo. App. 2015). Thus, an action lies or could lie in tort if the defendant's duties, which are implied

---

Constitution, *see Arndt v. Koby*, 309 F.3d 1247, 1255 (10th Cir. 2002), and, for this reason, "no implied remedy is necessary," *see Bd. of Cty. Comm'rs of Douglas Cty. v. Sundheim*, 926 P.2d 545, 553 (Colo. 1996). Accordingly, this court respectfully RECOMMENDS that Claims III-V and VIII be DISMISSED to the extent each asserts a claim under the Colorado Constitution. However, for the reasons stated below, Plaintiff may proceed under the Colorado Constitution for damages under Claim II. Thus, this court examines Claims III-V and VIII under the federal Constitution only.

by law, are designed to protect against the risk of harm to persons or property. *Foster v. Bd. of Governors of the Colorado State Univ. Sys. by & on behalf of Colorado State Univ.*, 342 P.3d 497, 501 (Colo. App. 2014).

As relevant here, "a promissory estoppel claim is properly characterized as one in the nature of a contract claim and is thus not barred by the [CGIA]." *Bd. of Cty. Comm'rs of Summit Cty. v. DeLozier*, 917 P.2d 714, 715 (Colo. 1996) ("*DeLozier*"). However, the "doctrine of promissory estoppel should not be confused with the doctrine of equitable estoppel[,]" which applies to misstatements of fact and lies in tort.[7] *Id.* at 716. For example, "a contracting party's negligent misrepresentation of material facts prior to the execution of an agreement may provide the basis for a tort claim asserted by a party detrimentally relying on such negligent misrepresentations[,]" and, where contract and tort principles overlap, the CGIA bars such claims. *See Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1004–05 (Colo. 2008) (explaining, "a claim that is supported by allegations of misrepresentation or fraud is likely a claim that could lie in tort.").

Heartland contends that the SAC adequately alleges that the Board "promised" that Heartland could operate the Facility "*going forward*," a promise the Board did not keep, but that

---

[7] The Colorado Supreme Court has clarified that equitable estoppel is not actually a cause of action; rather, it is "more precisely characterized as an equitable doctrine that suggests a tort-related theory in that it attempts to allocate loss resulting from the misrepresentation of facts to the most culpable party and to ameliorate an innocent party's losses." *Wheat Ridge Urban Renewal Authority v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007). However, "the delineation between promissory estoppel and equitable estoppel is helpful for the purpose of assessing whether a claim lies or could lie in tort." *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1004 n.5 (Colo. 2008). At oral argument, Heartland repeatedly clarified that its reliance on equitable estoppel was purely doctrinal, and that it was not alleging an equitable estoppel claim. *E.g.*, [#104 at 37:23–38:7]; *accord Kohn v. City of Boulder*, 919 P.2d 822, 825 (Colo. App. 1995) (explaining that equitable estoppel "bars a municipality from refusing to satisfy an obligation by taking a position contrary to a previous representation reasonably relied upon by the party dealing with the city to the party's detriment."), *abrogation recognized by Allen Homesite Grp. v. Colorado Water Quality Control Comm'n*, 19 P.3d 32 (Colo. App. 2000).

Plaintiff relied on to its detriment. [#83 at 18–19 (emphasis in original)]. Specifically, Plaintiff avers that in October 2013, following Heartland Renewable's transfer of the Facility to Plaintiff, the Board affirmed its promise that Plaintiff owned the Facility and could continue its development of the Facility without government interference. *See* [*id.* at 19]. For the following reasons, this court respectfully disagrees; several cases from Colorado guide this court's inquiry.

First, in *DeLozier*, Ms. DeLozier filed a complaint against the Board of County Commissioners of Summit County ("Commissioners of Summit County") asserting claims for breach of contract and promissory estoppel. 917 P.2d at 715. The basis of Ms. DeLozier's promissory estoppel claim was that the Commissioners of Summit County promised to offer Ms. DeLozier the next available paramedic position with the ambulance service, which was allegedly to occur in early 1993. *Id.* In alleged reliance on this promise, Ms. DeLozier left her job in Denver and moved to Summit County in December 1992; however, the ambulance service hired a different applicant in February of 1993. *Id.* The Colorado Supreme Court held that Ms. DeLozier's promissory estoppel claim sounded in contract and was thus not barred by the CGIA, because she alleged *a future promise* of employment with the ambulance service, that she relied on that *future promise* to her detriment, and that the Commissioners of Summit County broke that *future promise*—there was no allegation of any misrepresented facts that existed to support a claim for fraud or misrepresentation. *See id.* at 716–17.

Second, in *Lehman v. City of Louisville*, the plaintiffs alleged that they relied on a city official's representations that they could purchase an historic church and renovate that church for use as a family residence and place of business operated by non-family members. 857 P.2d 455, 456 (Colo. App. 1992). Subsequent to the plaintiffs' purchase and renovation of the church, the City Administrator determined that the plaintiffs' use of the property violated a Louisville zoning

ordinance.  *Id.*  The plaintiffs filed suit, seeking damages and injunctive relief under a theory of common law estoppel.  *Id.*  A division of the Colorado Court of Appeals held that the CGIA barred plaintiffs claim, because the plaintiffs relied to their detriment on *past* misrepresentations of fact by a city official, i.e., that they could renovate and use the church as a residence and place of business, which "could lie in tort."  *Id.* at 457.

Relatedly, in *Patzer v. City of Loveland*, the plaintiffs brought suit following the defendant's failure to issue a certificate of occupancy upon the plaintiffs' completion of a residence in accordance with a city-issued building permit.  80 P.3d 908, 910 (Colo. App. 2003).  The plaintiffs asserted, *inter alia*, a promissory estoppel claim against the defendant and sought damages for the costs they incurred "as a result of being unable to market [their] property until the [defendant] issued the certificate of occupancy."  *Id.*  A division of the Colorado Court of Appeals held that the CGIA barred the plaintiffs' promissory estoppel claim, because the building permit contained no *future* promise to issue a certificate of occupancy, and that the CGIA barred any potential negligent misrepresentation claim based on the defendant's issuance of the building permit *in the past* despite an ultimately faulty engineering report.  *Id.* at 912.

Lastly, in *Robinson v. Colorado State Lottery Division*, the Colorado Supreme Court reemphasized the proposition that the characterization of the claim is not determinative on whether the claim lies or could lie in tort; rather, the inquiry focuses on the nature of the injury and requested relief.  179 P.3d at 1003 ("[T]he relief requested informs our understanding of the nature of the injury and the duty allegedly breached.").  The Colorado Supreme Court went on to hold that the plaintiff's unjust enrichment claim could lie in tort, because Ms. Robinson's injury, i.e., buying lottery tickets based on the misrepresentation that the advertised prizes were still available, "presented an injury which appear[ed] to be based on tortious conduct" and sought the

equivalent of damages for the defendant's tortious misrepresentations.  *Id.* at 1007–08; *cf. Open Door Ministries v. Lipschuetz*, 373 P.3d 575, 580 (Colo. 2016) (noting that Colorado case law examining whether a claim could lie "all revolved around a plaintiff's claim for relief from past or ongoing injury.").

Heartland's case presents a situation arising from *past* alleged misrepresentations.  The SAC alleges that, following Heartland Renewable's transfer of the Facility to Plaintiff, the Board affirmed its promise that Plaintiff owned the Facility, possessed a valid CD, and could "build and operate the Facility free from government challenges based on the Certificate of Designation." [#64 at ¶ 46]; *see also* [*id.* at ¶¶ 136–39].  The SAC continues that the Board approved an Improvements Agreement and accepted collateral for USR-1704 from Plaintiff, certified the approval of the plat for USR-1704, and never suggested that Plaintiff lacked the requisite permitting or CD to continue its development of the Facility.  [*Id.* at ¶¶ 50, 52, 56].  Further, the SAC alleges that in reliance on these "promises," Heartland expended over $100 million in developing and constructing the facility.  *See* [*id.* at ¶¶ 57–60, 137–39].  However, based on Defendant Kreutzer's November 8 letter, the Board reversed course and suspended USR-1704 temporarily, because Plaintiff did not have a valid CD.  *See* [*id.* at ¶ 140].  In doing so, Plaintiff eventually closed and "permanent[ly] los[t] [] its business."  [*Id.* at ¶ 141].

Essentially, Heartland alleges that the Board's repeated assurances *in the past* that it owned the Facility and possessed a valid CD induced its development and construction of the Facility.  Because of this, Heartland seeks compensatory damages for a past injury.  *See Robinson*, 179 P.3d at 1004 (recognizing that economic-loss claims, such as negligent misrepresentation, sound in tort).  Though Heartland frequently labels these assurances "promises," this court respectfully agrees with the Board that no such promises were ever made.

Notably, there was no promise by the Board to perform some future act, e.g., approve a new CD or additional amendments to USR-1704. *See Patzer*, 80 P.3d at 912 ("A claim that is based not on a promised performance in the future, but rather on an alleged misrepresentation of facts, is fundamentally a tort claim and barred by the [CGIA].").  Rather, any alleged representation that Heartland could operate the Facility free from government inference was premised on the Board's *past* misrepresentations of material facts, whether negligent or intentional, that Plaintiff possessed the requisite permits and CD.  Indeed, Plaintiff also recognized that there is no right under an issued use permit to indefinite, uninterrupted use of one's property or else all property owners could assert plausible promissory estoppel claims against a zoning authority.  *See* [#104 at 40:9–22, 51:9–52:5].  Nor did Plaintiff assert, either in the operative pleading or at oral argument, that any Defendant assured them that future permits were forthcoming.  Instead, the SAC, as well as Plaintiff's Response, stress the fact that the Board's temporary suspension of USR-1704 based on an invalid CD constituted a drastic shift in the Board's position over the previous three years wherein Heartland commenced substantial actions in reliance on the Board's representations and actions.  *See* [#64 at ¶ 140; #83 at 9–10, 18–19].  As discussed, such misrepresentations are indicative of a tort-related claim under the doctrine of equitable estoppel. *See DeLozier*, 917 P.2d at 716 (delineating equitable and promissory estoppel for purposes of the CGIA).

Finally, Plaintiff's reliance on *Fifth Third Bank of Western Ohio v. United States*, 52 Fed. Cl. 264, 271–72 (2002) ("*Fifth Third Bank*") is misplaced.  *Fifth Third Bank* dealt with the unique situation when a plaintiff could establish a breach of contract claim against a government based on *United States v. Winstar Corp.*, 518 U.S. 839 (1996) ("*Winstar*").  The United States Court of Federal Claims ("Court of Federal Claims") explained,

> In its sovereign capacity as regulator, the Government routinely applies and enforces standards to which private entities must conform their activities. Private parties often are required to obtain the approval of an administrative agency for a given course of conduct spanning a given period of time. The regulatory act of approval is ordinarily a statement that the conduct conforms with existing law or policy and no more. Absent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise.

*Id.* at 270. The Court of Federal Claims went on to explain that in some instances the "Government can and does make promises regarding its regulatory function" such as when the Government acts "in its capacity analogous to a private insurer." *Id.* at 270–71 (internal quotations and citations omitted). For example, this may occur where the federal government approves mergers with failing thrifts, and the documents and circumstances surrounding those approvals can be reasonably interpreted as creating a binding promise (i.e., contract) that the federal government will not then interfere or destroy those transactions. *See id.* (quoting *Winstar*, 518 U.S. at 894 (concluding that the "the Bank Board resolutions, Forbearance Letters, and other documents setting forth the accounting treatment to be accorded," were not "mere statements of then-current regulatory policy, but in each instance were terms in an allocation of risk of regulatory change that was essential to the contract between the parties.")).

Despite Heartland's attempts to fit its promissory estoppel claim into *Fifth Third Bank's* mold, the SAC and supporting exhibits do not establish any binding promise for future action from the Board that could be construed as a contract, or that could form the basis of a promissory estoppel claim. Accordingly, this court respectfully concludes that the CGIA bars Plaintiff's promissory estoppel claim because this claim lies or could lie in tort, and respectfully RECOMMENDS that Claim I be DISMISSED.

## 2. Claim II – Regulatory Taking

Plaintiff asserts its Regulatory Taking claim pursuant to the United States Constitution and the Colorado Constitution. *See* [#64 at ¶ 151; #83 at 5 n.3]. Though it has been said that the Colorado Constitution provides greater protection than the Fifth Amendment of the United States Constitution, *see City of Northglenn v. Grynberg*, 846 P.2d 175, 178 (Colo. 1993), the Colorado takings clause, art. II, § 15, has been interpreted as consistent with the federal clause, *see Cent. Colorado Water Conservancy Dist. v. Simpson*, 877 P.2d 335, 346 (Colo. 1994). Accordingly, this court considers Heartland's regulatory takings claim under both the federal and Colorado Constitution simultaneously.

Federal takings claims are grounded in the Fifth Amendment's prohibition against private property "be[ing] taken for public use, without just compensation," which applies to the states through the Fourteenth Amendment. *Kelo v. City of New London, Conn.*, 545 U.S. 469, 472 n.1 (2005). Though not specifically contemplated by the Fifth Amendment, the Supreme Court has since recognized that "'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Generally, regulatory acts constitute a taking if they are a *per se* taking, i.e., a permanent physical invasion of one's property or a complete deprivation of all economically beneficial use of one's property; or "a taking as characterized by the standards set forth in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)."[8] *See Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1208 (10th Cir. 2009) (discussing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538, 546–48 (2005)).

---

[8] These factors include the economic impact on the property owner, the interference with a "distinct investment-backed expectation," and the character of the government's invasion. *See Penn. Cent. Transp. Co.*, 438 U.S. at 125.

Likewise, art. II, § 15 of the Colorado Constitution provides, in pertinent part, "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." Colo. Const. art. II, § 15.  Indeed, even "[w]hen a portion of a landowner's property is taken, just compensation includes compensation for injury to the remainder of the property as well as payment for the portion actually taken." *Dep't of Transp. of State v. Marilyn Hickey Ministries*, 159 P.3d 111, 113 (Colo. 2007) (internal quotations and citation omitted).  A landowner may allege a sufficient state-law regulatory takings claim if the regulation constitutes a taking *per se* or if the regulation constitutes a taking under the fact-specific inquiry of *Penn Central*.  *See Animas Valley Sand & Gravel, Inc. v. Bd. of Cty. Comm'rs of Cty. of La Plata*, 38 P.3d 59, 65 (Colo. 2001) (noting that such a fact-specific inquiry contemplates a situation in which the property retains more than a de minimis value, and, when considered in conjunction with other factors, the property was effectively taken from its owner).

The Board moves to dismiss Claim II, because Plaintiff's regulatory taking claim (similar to its other constitutional claims) is unripe.  *See* [#73 at 2, 4–5; #86 at 3–4].  The question of ripeness, like other challenges to a court's subject matter jurisdiction, is treated as a motion under Rule 12(b)(1).  *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).  The ripeness doctrine reflects an important prudential limitation on the court's exercise of jurisdiction—the inquiry focuses on whether the alleged harm has matured sufficiently to warrant judicial intervention.  *See Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004) (noting, "[r]ipeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." (internal quotations and citation omitted)).  "When assessing ripeness, we must 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration.'" *Utah v. U.S. Dep't of the Interior*, 210 F.3d 1193, 1196 (10th Cir. 2000) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

As relevant here, the Supreme Court has articulated a two-prong ripeness test for regulatory takings claims. First, there must be a final agency decision as to how the regulation will be applied to the property; second, the property owner must have sought and been denied just compensation through the state's adequate procedures.[9] *See Alto Eldorado P'ship v. Cty. of Santa Fe*, 634 F.3d 1170, 1174 (10th Cir. 2011) (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186–95 (1985)). The finality requirement is also applicable to regulatory takings claims under the Colorado Constitution. *See Droste v. Bd. of Cty. Comm'rs of Cty. of Pitkin*, 85 P.3d 585, 591 (Colo. App. 2003) (explaining that a Colorado takings claim is not ripe until "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." (internal quotations and citation omitted)).

Here, the Board argues that Claim II is unripe because it has yet to issue a final decision in this matter; rather, it chose only to suspend USR-1704 temporarily, and Plaintiff has not suffered any significant injury from this decision. [#73 at 5; #86 at 3–4]. Conversely, Plaintiff contends that the Board's decision to suspend USR-1704 temporarily *is* a final agency action, as the Board unequivocally determined that Plaintiff operated the Facility without a valid CD in violation of state regulations and, thus, could not operate the Facility until procuring a new CD.

---

[9] For purposes of the Motion to Dismiss, the Board conceded that it does not have eminent domain authority, *see* [#104 at 10:21–11:6], a fact that negates the requirement that a property owner first seek just compensation through adequate state procedures. *See Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1575 (10th Cir. 1995) (holding that the plaintiff's takings claim was ripe because the defendant lacked eminent domain powers); *accord State, Dep't of Health v. The Mill*, 809 P.2d 434, 439 (Colo. 1991) (same).

*See* [#83 at 3–5]. This court respectfully agrees with Heartland that even a temporary suspension of USR-1704 constitutes a final decision by the Board.

For a decision to be final there must be a "definitive action by local authorities indicating with some specificity what level of development will be permitted on the property in question." *Landmark Land Co. of Oklahoma v. Buchanan*, 874 F.2d 717, 720 (10th Cir. 1989) *abrogated on other grounds by Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190 (10th Cir. 1999). In other words, a final decision is one where "'the permissible uses of the property are known [by the court] to a reasonable degree of certainty.'" *Cooley v. United States*, 324 F.3d 1297, 1301 (Fed. Cir. 2003) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001)). Here, the permissible uses of the Facility are known—Heartland cannot operate under USR-1704 unless and until it applies for a new CD that *the Board* must then approve. *See* [#64 at ¶ 121; #64-17 at 8]. As vigorously asserted by Heartland at oral argument, the factual reality is that the biological compounds required to operate the Facility could not merely be sustained indefinitely during a suspension but, rather, immediately began deteriorating. *See* [#104 at 28:15–23]. Thus, this court agrees with Heartland that the decision to suspend USR-1704 temporarily constitutes a final decision for ripeness purposes. This is because the Board's suspension, though temporary, marks the "consummation" of the Board's decision making process and is one by which Heartland's "rights or obligations have been determined," or from which "legal consequences will flow," i.e., the temporary suspension of USR-1704 and the Facility's operations. *Cf. Bennett v. Spear*, 520 U.S. 154, 178–79 (1997) (explaining finalty in the context of the Administrative Procedures Act); *accord Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 616 (2014) (applying *Bennett's* finality definition to final action in the context of a takings claim). Though the Board makes much of the notion that the suspension of USR-

1704 is temporary,[10] this does not prove fatal to Heartland's regulatory taking claim. *See*

*generally Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321

(2002) (considering whether a temporary moratoria on development constitutes a regulatory

taking). Therefore, this court concludes that Claim II is ripe for review.

### 3. Claims III, IV, and V

Relatedly, the Board moves to dismiss Heartland's remaining federal claims—Claims III,

IV, and V—on the basis that they, too, are unripe for want of a final agency decision. *See* [#73

at 4; #86 at 4–5]. The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has

expressed its reluctance

> in the context of a factual situation that falls squarely within that clause [the Fifth
> Amendment's Takings Clause] to impose new and potentially inconsistent
> obligations upon the parties under the substantive or procedural components of
> the Due Process Clause. It is appropriate in this case to subsume the more
> generalized Fourteenth Amendment due process protections within the more
> particularized protections of the Just Compensation Clause.

*Miller v. Campbell Cty.*, 945 F.2d 348, 352 (10th Cir. 1991). Indeed, the Tenth Circuit has

consistently applied the takings ripeness test to due process claims (procedural and substantive)

as well as equal protection claims that "rest upon the same facts as a concomitant takings claim."

*Bateman v. City of W. Bountiful*, 89 F.3d 704, 709 (10th Cir. 1996) (collecting cases); *see also*

*Schanzenbach v. Town of La Barge*, 706 F.3d 1277, 1282–83 (10th Cir. 2013). However, as

discussed *supra*, this court respectfully concludes that Plaintiff's regulatory taking claim is ripe,

---

[10] In support of its argument, the Board relies on *Tri County Industries, Inc. v. District of Columbia*, 104 F.3d 455, 458–59 (D.C. Cir. 1997). Though the D.C. Circuit may have intimated that a temporary suspension of a building permit in that case was not final, it did so because of plaintiff's failure to seek any administrative remedy regarding the temporary suspension, especially when the District of Columbia provided procedures for challenging such a decision. *See id.* (holding that the plaintiff failed to meet *Williamson County's* requirement that it "pursue[] its administrative remedies far enough to establish conclusively the effect of the regulations"). Here, the Board has final authority over the validity of the CD; thus, *Tri County* is inapposite.

and, therefore, concludes that Heartland's substantive due process claim (Claim III), equal protection claim (Claim IV), and procedural due process claim (Claim V) are also ripe.

### B.    The Individual Defendants

The Individual Defendants move to dismiss Claim III, V, and VIII pursuant to Rule 12(b)(1) on the basis that Plaintiff failed to timely file its claims for judicial review of a final agency action within the thirty-five (35) day limit prescribed under the Colorado Administrative Procedures Act, Colo. Rev. Stat. § 24–4–106(4). *See* [#90 at 5–7; #97 at 1–3]. This period is jurisdictional, *see Medina*, 35 P.3d at 452; therefore, "[f]ailure to seek timely review deprives the district court of jurisdiction." *Allen Homesite Group*, 19 P.3d at 34. The Individual Defendants argue that Plaintiff's constitutional claims against them essentially invite this court to review final actions of the CDPHE and, because, Plaintiff did not file these claims within thirty-five days from these actions, this court should dismiss Heartland's claims for lack of subject matter jurisdiction. *See* [#97 at 1–3].

However, as Heartland aptly avers [#95 at 5], it does not seek judicial review under the Colorado Administrative Procedure Act. Rather, it asserts its constitutional claims pursuant to § 1983; thus, there is no requirement that Plaintiff seek review within thirty-five days. *See Houghton ex rel. Houghton v. Reinertson*, 382 F.3d 1162, 1167 n.3 (10th Cir. 2004) (noting that exhaustion requirements do not apply to a plaintiff bringing a § 1983 claim challenging agency action). Accordingly, this court respectfully concludes that it has subject matter over Heartland's constitutional claims against the Individual Defendants.

## II.    Dismissal Under Rule 12(b)(6)

Alternatively, Defendants move to dismiss the SAC under Rule 12(b)(6) for failure to state claim. In addition, the Individual Defendants move to dismiss Heartland's claims against

them on qualified immunity grounds.  This court considers these arguments below as to Claims II-V and VIII that survive this court's subject matter jurisdiction analysis.

## A.    The Board

### 1.    Claim II – Regulatory Taking

As mentioned, a property owner may be entitled to just compensation if a regulation "goes too far," such as depriving a landowner of all "economically beneficial use." *Clajon Prod. Corp.*, 70 F.3d at 1577 (noting, however, that this inquiry focuses on the entire bundle of property rights, not just "a single stick in the bundle") (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014–16 (1992)); *see also First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 318–19 (1987) (recognizing that even "temporary" takings that deny a property owner of all use of her property requires just compensation).  If, however, this is not the case, a regulatory taking may still have occurred under the *Penn Central* factors.  *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 331 (explaining that the categorical rule in *Lucas* "was carved out for the 'extraordinary case'"). "The *Penn Central* inquiry focuses on the magnitude of the economic impact of the regulatory action and the extent of the regulation's interference with property rights to determine if the regulatory action constitutes a taking."  *Alto Eldorado P'ship*, 634 F.3d at 1174 (citation omitted).  Under the Colorado Constitution, a regulatory taking may occur when "governmental activity substantially impairs an owner's use of the property."  *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 706 (Colo. App. 2010) (internal quotations, alterations, and citations omitted).  And, a Colorado landowner may still establish a regulatory taking under the fact-specific inquiry of *Penn Central*.  *See Animas Valley Sand & Gravel, Inc.*, 38 P.3d at 65 (citing *Palazzolo*, 533 U.S. at 617 (discussing the *Penn Central* factors)).

As an alternate ground for dismissing Claim II, the Board argues that Plaintiff cannot allege that the temporary suspension of USR-1704 has deprived its whole parcel of property of all economically beneficial use. *See* [#73 at 5–6; #86 at 5–6]. Further, the Board contends that "mere fluctuations in value during the process of governmental decision making" does not entitle Heartland to just compensation. [#73 at 5]. Further still, any deprivation of economic use of the Facility is attributable to Plaintiff's failure to obtain a valid CD, not any decision by the Board. *See* [#86 at 5]. Thus, according to the Board, Plaintiff's regulatory takings claim fails as a matter of law.

In response, Plaintiff avers that the SAC sufficiently alleges a regulatory takings claim, because the temporary suspension of USR-1704 deprived Heartland of all economically beneficial use of the Facility, which is designed to exclusively process biowaste for specific purposes. [#83 at 6]. Further, Heartland avers that the SAC alleges the economic impact of the regulatory action had on Heartland's investment-backed expectations. [*Id.* at 7]. For the following reasons, this court respectfully agrees.

The SAC alleges, "the [Board's] decision to suspend Heartland's Special Review Permit deprived [it] of any economically reasonable use of the property," because Plaintiff modified the Facility to be "exclusively suited to its renewable energy biogas operation." [#64 at ¶ 147]; *see also* [#104 at 28:20–23 ("[T]hat final decision killed the facility, literally killed the facility.")]. For example, "because of the temporary biologic nature of the Facility, a temporary shutdown of even a 6-month period would cause Heartland to incur an estimated one-time $29,473,689 in shutdown and restart costs" and roughly $3,212,850 per month in lost revenue. [*Id.* at ¶ 127]. Because of this and the unique biological maquillage of the Facility, Heartland alleges that the temporary suspension forced it to cease operations entirely, thereby foregoing its expected

profits and its $102 million investment.  *See* [*id.* at ¶¶ 127–34, 145–52].  This court finds these allegations sufficient to state a plausible regulatory takings claim under the federal and Colorado Constitution.

Certainly, the vast evidentiary record that both Parties urged this court to consider may ultimately reveal that Plaintiff cannot succeed on its regulatory takings claim; however, that determination is not before this court at this stage.  *See Rader v. Elec. Payment Sys., LLC*, No. 11-CV-01482-MSK-CBS, 2012 WL 4336175, at *6 (D. Colo. Sept. 21, 2012).  And, although the Board is correct that a regulation that wholly eliminates all economical beneficial use of an owner's fee simple occurs only in "extraordinary circumstances," *see Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 330, this court respectfully disagrees with the Board that Plaintiff "puts all its regulatory taking eggs into the total taking basket[.]"  [#86 at 6].  Rather, this court finds it sufficient that the SAC alleges that the temporary suspension of the Facility's operations imposed costs and constraints on Heartland such that it was forced to cease operations entirely, thereby foregoing its expected profits and its $102 million investment.  *See* [#64 at ¶¶ 127–34, 145–52].  This being after the Board and the CDPHE assured Plaintiff that its CD was valid.  *See* [*id.* at ¶¶ 51, 54, 56, 59–61].  Such allegations, while alleging a permanent deprivation, also adequately allege the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action.  *See Alto Eldorado P'ship*, 634 F.3d at 1174; *Animas Valley Sand & Gravel, Inc.*, 38 P.3d at 65.  Thus, this court concludes that Plaintiff sufficiently alleges a regulatory takings claim, and respectfully RECOMMENDS that the Board's Motion to Dismiss be DENIED as to Claim II.

### 2.     Claim III – Substantive Due Process

To state a substantive due process claim, Heartland must first allege a property or liberty interest warranting due process protections.  *See Cross Continent Dev., LLC v. Town of Akron, Colo.*, 742 F. Supp. 2d 1179, 1190 (D. Colo. 2010); *cf. 211 Eighth, LLC*, 922 F. Supp. 2d 1174, 1183 (D. Colo. 2013) ("The rights protected by substantive due process are carefully delimited to 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition,' and thus are 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" (citation omitted)).  "An abstract need for, or unilateral expectation of, a benefit does not constitute property. [. . .]  Rather, the constitutional purpose of Due Process is to protect a substantive interest to which a party has a legitimate claim of entitlement."  *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (internal brackets, ellipses, citations, and quotations omitted).  In the municipal land-use context, the inquiry focuses on the level of discretion allowed to the decisionmaker— only if a decision is legally mandatory, i.e., where the decisionmaker's discretion is limited by the procedures in question and adherence to those procedures requires a particular outcome, does a legitimate claim of entitlement exist.  *See Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1237 (10th Cir. 2016) (dismissing the plaintiff's substantive due process claim for want of a protected property interest, because it failed to cite to any authority "limiting the City's discretion to revoke or modify a special-use permit").

If Heartland alleges a sufficient property interest, it must also allege that the challenged governmental action was "arbitrary and capricious."  *Crider v. Bd. of Cty. Comm'rs of Cty. of Boulder*, 246 F.3d 1285, 1289 (10th Cir. 2001).  "An arbitrary deprivation of a property right may violate the substantive component of the Due Process Clause if the arbitrariness is extreme."

*Klen v. City of Loveland, Colo.*, 661 F.3d 498, 512–13 (10th Cir. 2011). Arbitrary, however, does not mean erroneous; rather, an arbitrary action is one that has "no conceivable rational relationship to the exercise of the state's traditional police power through zoning." *Norton v. Vill. of Corrales*, 103 F.3d 928, 932 (10th Cir. 1996) (quotations and citations omitted). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking[,]" and Heartland must do more than allege that the government actor intentionally or recklessly caused its injury by abusing or misusing government power.[11] *Klen*, 661 F.3d at 513 (internal quotations and citations omitted).

Claim III asserts a substantive due process claim against the Board and Defendant Kreutzer,[12] alleging that Plaintiff had a protected property interest in the Facility, specifically the CD and USR-1704, and, because of this, it "has the right to use its own real property as it sees fit." [#64 at ¶ 154]. Further, Heartland contends that it relied on the Board's and the CDPHE's assurances over the previous three years that it had a valid CD when it continued development and operation of the Facility, which created a protected property interest in the CD and USR-1704. *See* [#64 at 30–33]. Additionally, Heartland alleges that Defendant Kreutzer's opinion that the CD was in fact invalid and the Board's suspension of USR-1704 based on the same allegedly erroneous conclusion, constituted arbitrary and irrational actions [*id.*], especially

---

[11] The Tenth Circuit has held that courts analyzing a substantive due process claim "should not unilaterally choose to consider only one or the other of the ["shocks the conscience" or "fundamental liberty] strands," as both tests may be applied "in any given case." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008). Here, however, Plaintiff's right to use its property as it sees fit is "not one of the traditionally recognized fundamental rights for purposes of substantive due process." *211 Eighth, LLC*, 922 F. Supp. 2d at 1184. Thus, this court focuses its inquiry on the "shocks the conscience" test.

[12] Because the Individual Defendants invoke qualified immunity, this court considers their Motion to Dismiss separately *infra*.

because there was "*absolutely no change in any of the underlying facts*." [#83 at 11 (emphasis in original)].

First, the Board moves to dismiss Claim III, because Plaintiff did not have a protected property interest in either the CD or USR-1704. *See* [#73 at 8–9; #86 at 7–8]. Plaintiff responds that it has a protected property interest in both, citing to *Cross Continent Development, LLC v. Town of Akron, Colorado*, 742 F. Supp. 2d 1179, 1190 (D. Colo. 2010) ("*Cross Continent*"). *Cross Continent*, however, recognized a property interest in a commercial leasehold under both state and federal law, which is not at issue in this matter. *Id.* at 1188–90. As discussed, a legal entitlement in the land-use context focuses on the decisionmaker's discretion. *See Zia Shadows, L.L.C.*, 829 F.3d at 1237.

Additionally, Heartland avers that the Board is "equitably estopped" from denying the existence of Heartland's protected property interest in both the CD and USR-1704. *See* [#83 at 9–10; #95 at 8–9]. Heartland's argument relies on the proposition that, under Colorado common law, a property right vests when a party takes substantial steps in reliance on a building permit. *See Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs of Cty. of Arapahoe, Colo.*, 633 F.3d 1022, 1029 (10th Cir. 2011) (quoting *Villa at Greeley, Inc. v. Hopper*, 917 P.2d 350, 356 (Colo. App. 1996)). Plaintiff also relies on *Eason v. Board of County Commissioners* wherein a division of the Colorado Court of Appeals held that the plaintiff had a protected property interest in a "zoning classification" when he relied on (1) the final zoning allowing the intended use of his property; (2) an affirmative written correspondence by the County confirming his intended use; (3) the issuance of a building permit; and (4) the operation of his business for two years. 70 P.3d 600, 603–06 (Colo. App. 2003); *see also Moreland Properties, LLC v. City of Thornton*, 559 F. Supp. 2d 1133, 1146 (D. Colo. 2008) (holding that the plaintiff had a vested property interest in a

zoning classification based on *Eason*).  Though this case does not involve a zoning classification, this court assumes without deciding that Plaintiff had a property interest in the CD and USR-1704 based on the doctrine of equitable estoppel.  *But see* Colo. Rev. Stat. § 30–20–104(2) (granting discretion to the Board as to whether it will approve a CD); *Nichols v. Bd. of Cty. Comm'rs of Cty. of La Plata, Colo.*, 506 F.3d 962, 970 (10th Cir. 2007) (holding that the plaintiffs had no property interest in their special use permit, because they failed to provide any authority that the defendant's land-use and zoning decisionmaking was limited in anyway).

Nonetheless, this court respectfully concludes that Claim III should be dismissed for failure to allege that the Board's actions were arbitrary and irrational.[13]  Heartland argues that the suspension of USR-1704 was "unusual, arbitrary, capricious, [and] irrational," because the Board based the suspension "upon improper considerations unconnected with legitimate governmental objectives."  [#83 at 10].  Specifically, such improper considerations include:  (1) a "misunderstanding and misapplication of the law"; (2) "political motivations based on vocal neighbors who applied pressure on the [Board]"; (3) "relying on activist complaints instead of the multitude of evidence presented by both County staff and Heartland to reach findings of fact"; and (4) "imposing harsh penalties that bear no rational relation to the alleged violations."

---

[13]  The Board also moves to dismiss Claim III because it should be subsumed by Claim II, Plaintiff's regulatory takings claim.  *See* [#73 at 10].  The Tenth Circuit has expressed its reluctance to impose "new and potentially inconsistent obligations upon parties under the substantive or procedural components of the Due Process Clause" when the more particularized protections of the Just Compensation Clause provide sufficient relief.  *Miller*, 945 F.2d at 352 (subsuming the more generalized due process claims within the more particularized protection of the Just Compensation Clause).  Though Heartland contends that its substantive due process claims are distinct from its regulatory takings claim, *see* [#83 at 12–13; #104 at 31:6–32:19, 33:5–16], both focus on an alleged deprivation of Plaintiff's right to operate the Facility, based on the Board's suspension of USR-1704 for lack of a valid CD.  This court is not persuaded that there is a distinction between Claim II and III.  *Cf. Schanzenbach*, 706 F.3d at 1283 (holding that the plaintiff's *procedural*-due process claim was conceptually distinct from his takings claim, because his due process claim alleged that the defendant did not provide him an adequate opportunity to be heard before revoking his building permit).  Therefore, this court concludes that this is an alternative basis for dismissal.

[*Id.* (citing [#64 at ¶ 177])].  More importantly, no underlying fact changed within the three years of the Board first assuring Heartland that it possessed the proper permits for operating the Facility, but then reversed course without any explanation.  [*Id.* at 10–12].

Heartland's allegations, however, are insufficient to maintain a substantive due process claim for several reasons.  First, "[t]he Due Process Clause is not a guarantee against incorrect or ill-advised government decisions," *Camuglia v. The City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006); that is, the Board's "misunderstanding and misapplication of the law" does not constitute such egregious conduct to state a substantive due process claim, *see Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011); *accord Leatherwood v. Allbaugh*, 861 F.3d 1034, 1046 (10th Cir. 2017) ("[T]he deprivation occasioned by the state's failure to follow its own law must be arbitrary in the constitutional sense" (internal quotations and citation omitted)).  Next, the Board's "actual motivations [] are irrelevant to a substantive due process claim." *Crider*, 246 F.3d at 1290; *cf. Mongeau v. City of Marlborough*, 492 F.3d 14, 19–20 (1st Cir. 2007) (holding that, absent allegations of threats or bribery, a city official's hostility and animus motivating the revocation of a building permit did not shock the conscience).  Lastly, to the extent that the Board found subjective complaints more probative than other evidence, or imposed too harsh of penalties, this court respectfully concludes that these allegations fail to establish conscience-shocking behavior.  For example, in *Klen v. City of Loveland, Colorado*, the Tenth Circuit considered the plaintiffs' allegations that "the defendants 'engaged in a continuous campaign of harassment, deceit, and delay' . . . intended to injure [the plaintiffs] and their associates in a way unjustifiable by any government interest," and subjected them to malicious delays in the issuance of building permits, the imposition of conditions and fees not authorized by law, and retaliatory citations and further delay after they complained.  661 F.3d at 511–12 &

511 n.6. The Tenth Circuit concluded that these allegations did not "rise to the level of conscience-shocking behavior[,] [as] [m]any of their complaints are examples of the kind of disagreement that is frequent in planning disputes." *Id.* at 513 (internal quotations and citations omitted). This court reaches a similar conclusion here, and also finds that the Board's conduct bore a conceivable rational relationship to its interest in ensuring compliance with state environmental laws and protecting public health. *See* [#73 at 8; #86 at 9]; *see also* Colo. Rev. Stat. § 30–20–100.5(1)(b) ("Improper disposal of solid wastes poses significant public health risks, environmental hazards, and long-term liability for the citizens of the state"). Therefore, this court respectfully RECOMMENDS that Claim III be DISMISSED against the Board.

### 3. Claim IV – Equal Protection

"An equal protection violation occurs when the government treats someone differently than another who is similarly situated." *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996). The Equal Protection Clause does not guarantee nor suggest that the law may never draw distinctions between individuals, nor does it provide a safeguard against arbitrary or unlawful governmental action like the Due Process Clause; rather, it requires there be some rational reason for the distinction. *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). Unless the law categorizes individuals based on a suspect classification, e.g., race, the law must be at least rationally related to a legitimate governmental purpose. *See United States v. Titley*, 770 F.3d 1357, 1359 (10th Cir. 2014) (noting that courts accord a strong presumption of validity to laws analyzed under rational basis review); *accord Clajon Prod. Corp.*, 70 F.3d at 1580 ("Economic regulations—i.e., those burdening one's property rights—have traditionally been afforded only rational relation scrutiny under the Equal Protection Clause.").

Here, Plaintiff is not a member of a suspect class. Rather, the SAC purportedly asserts an equal protection claim based on the class-of-one theory; this requires Heartland to allege that the Board intentionally treated it differently than those similarly situated, and that this difference in treatment was "objectively irrational and abusive." *See Furlong Enterprises, LLC v. Nickerson*, 785 F. Supp. 2d 970, 980 (D. Colo. 2011). On a motion to dismiss, a plaintiff must still identify specific examples of similarly situated individuals and how they were treated differently— general allegations that others were treated differently will not suffice. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216–19 (10th Cir. 2011) (discussing the recent developments within the class-of-one jurisprudence, and its applicability in the wake of *Twombly/Iqbal's* pleading standards).

The Board moves to dismiss Claim IV, because Plaintiff fails to allege disparate treatment by the Board of materially similar entities, and because Plaintiff fails to allege that the Board's actions were not rationally related to a legitimate governmental purpose. *See* [#73 at 11–12; #86 at 12–14]. Heartland responds that it has sufficiently alleged an equal protection claim, as the SAC "clearly alleges that Heartland was treated disparately as compared to the [Board's] other land-use permitting decisions" because it was a biogas company, and the Board predicated its suspension of USR-1704 on its own hostility to Heartland, not on the merits of Heartland's application. *See* [#83 at 14–16]. However, this court respectfully disagrees.

The SAC alleges that the Board subjected Heartland to "unprecedented enforcement efforts." [#64 at 22]. Specifically, the Weld County investigators "conducted no less than seven separate compliance inspections of the Facility, most of which were unannounced or conducted with little notice;" "[u]pon information and belief, the Board has not subjected any other permittee to such extensive enforcement efforts . . . its efforts against Heartland were

unprecedented, and no other entity has ever received such treatment;" the Board "singled out Heartland for disparate treatment as compared to similarly situated companies seeking land use permits in Weld, County," such as Tire Recycling, Inc.; and that the Board has allowed similarly situated entities to continue operating on a transferred CD with no suspension or revocation of their land-use permits. [*Id.* at ¶¶ 103, 105, 173, 175, 176]. However, these are only conclusory allegations that other similarly situated entities were treated differently. The SAC is devoid of specific factual allegations of how and when the Board treated any similarly situated entity differently, aside from vague notions that "no other entity received such treatment" and that Tire Recycling, Inc. was treated differently. *See Crider*, 246 F.3d at 1288–89 (holding that, while the plaintiffs and its identified comparator both owned eighty acres of adjacent land, the plaintiffs failed "to allege facts sufficient to establish that they are similarly situated" to the comparator). These allegations are insufficient to support Heartland's class-of-one equal protection claim. *See Kansas Penn Gambling, LLC*, 656 F.3d at 1220 (dismissing the plaintiff's class-of-one equal protection claim where the complaint failed to allege specific facts identifying how the defendants treated similarly situated entities differently, especially where the complaint addresses "the inherently subjective and individualized enforcement of health and safety regulations"); *see also id.* at 1216 ("We have approached class-of-one claims with caution, wary of turning even quotidian exercises of government discretion into constitutional causes." (internal quotations and citation omitted)).

Further, and for the reasons discussed *supra* regarding Heartland's substantive due process claim, this court also concludes that Plaintiff fails to allege that the Board's actions were not rationally related to its legitimate governmental interests in ensuring compliance with state environmental laws and protecting public safety. *See generally* [#64-1]; *see also* [#73 at 11; #86

at 14]; Colo. Rev. Stat. § 30–20–100.5(1)(b). Accordingly, this court respectfully RECOMMENDS that Claim IV be DISMISSED. *See Glover v. Mabrey*, 384 F. App'x 763, 778 (10th Cir. 2010) ("Glover has failed to allege, as it must, the identity or characteristics of other similarly situated contractors and how those similarly situated contractors were treated differently.").

### 4. Claim V – Procedural Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (quotations omitted). Whether an individual was denied procedural due process, courts must determine: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011)).

The Board moves to dismiss Claim V because Plaintiff received adequate process.[14] *See* [#73 at 12–14]. For the following reasons, this court respectfully agrees.

"Although the exact procedures required by the Constitution depend on the circumstances of a given case, the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Pater v. City of Casper*, 646 F.3d 1290, 1298

---

[14] Alternatively, the Board argues that Plaintiff's due process claim should be subsumed with its Regulatory Takings claim and dismissed for similar reasons. Though likely an additional avenue for dismissing Claim V, *see Rocky Mountain Materials & Asphalt, Inc. v. Bd. of Cty. Comm'rs of El Paso Cty.*, 972 F.2d 309, 311 (10th Cir. 1992) ("When a plaintiff alleges that he was denied a property interest without due process, and the loss of that property interest is the same loss upon which the plaintiff's takings claim is based, we have required the plaintiff to utilize the remedies applicable to the takings claim."), this court addresses only the Board's first basis for dismissal of Claim V. This is because this court assumes without deciding that Plaintiff's procedural due process claim is factually distinct from its regulatory takings claim. *See* [#83 at 12–13, 16–18].

(10th Cir. 2011) (internal quotations and citation omitted). "Where the government has deprived an individual of a protected interest, we must weigh the following factors to determine whether that individual received due process: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *McDonald v. Wise*, 769 F.3d 1202, 1213 (10th Cir. 2014) (quoting *Mathews*, 424 U.S. at 335). In reviewing these factors, this court respectfully concludes that Plaintiff received adequate process.

First, it is clear that the private interest affected in this matter is Heartland's operation of the Facility. Despite the alleged magnitude of this interest, there appears a little risk of an erroneous deprivation of such an interest and that additional procedures are unnecessary. For example, the SAC alleges that the Board held three separate show cause hearings, and, while raising certain issues for the first time at the November 14, 2016 hearing, i.e., the invalidity of Plaintiff's CD, the Board sought and received evidence as well as Plaintiff's written arguments on this point prior to the December 19, 2016 show cause hearing. *See* [#64 at ¶¶ 97–101, 110–16]. Further, the SAC attaches the transcript from the December 19, 2016 show cause hearing, which indicates that Heartland's legal representative argued its position that it held a valid CD before the Board, including Plaintiff's contention that Defendant Kreutzer had misinterpreted and misapplied applicable state law regarding transfers of CDs, and that the Board received testimony from various witnesses. *See generally* [#64-1]; *see also Rocky Mountain Rogues, Inc. v. Town of Alpine*, 375 F. App'x 887, 893 (10th Cir. 2010) (holding that the procedures employed little risk of erroneous deprivation when the plaintiff, represented by counsel, sought

review of the revocation of its building permit at multiple City Council meetings). Though the SAC alleges that Commissioner Kirkmeyer "prejudged" Plaintiff's case, Commissioner Kirkmeyer was just one of five Commissioners present for the hearing. [#64-1].

Lastly, there is no allegation as to what additional procedures or process Heartland was entitled to receive that it did not. At oral argument, Plaintiff argued that the adequate process due was additional time to meet and confer with Defendant Kreutzer and the CDPHE, to provide both with evidence that rebutted Defendant Kreutzer's November 8 letter, as well as a lengthier (or additional) hearing so that the Board had additional time to consider all of Heartland's evidence—additional process that would not burden the Board. *See* [#104 at 48:2–23, 49:5–23, 50:2–15, 76:19–77:10, 78:15–23, 79:21–80:24]. However, Heartland *did* contact Defendant Kreutzer after receiving his letter, *see* [#64-1 at 79:8–80:3], and could have also sought a hearing before the CDPHE regarding the letter, but failed to do so, *see* [#104 at 89:6–10]. *See also* [*id.* at 9:16 (indicating that the December 19 hearing lasted approximately seven (7) hours)]. While this court understands Heartland's concerns that the Board did not consider its evidence until after the lunch break, [*id.* at 47:5–16], "[t]he essence of procedural due process is the provision to the affected party of *some* kind of notice and . . . *some* kind of hearing." *Moore v. Bd. of Cty. Comm'rs of Cty. of Leavenworth*, 507 F.3d 1257, 1259 (10th Cir. 2007) (emphasis in original) (internal quotations and citations omitted). Based on the SAC, and corresponding exhibits surrounding the relevant show cause hearings, this court respectfully concludes that Heartland was not deprived of the process it was due. *See Garcia v. City of Albuquerque*, 232 F.3d 760, 770 (10th Cir. 2000) (holding that the plaintiff received all the process he was owed when he had three opportunities to challenge the defendant's adverse employment action).

Relatedly, to the extent Plaintiff alleges a violation of its procedural due process rights based on the Board's failure to follow state procedural requirements, e.g., the consideration of mitigating factors in its December 28, 2016 resolution, such violations "do[] not in [themselves] deny federal constitutional due process." *Onyx Properties LLC v. Bd. of Cty. Commn'rs of Elbert Cty.*, 838 F.3d 1039, 1044 (10th Cir. 2016). Thus, this court respectfully RECOMMENDS that Claim V be DISMISSED against the Board.

## B. The Individual Defendants

The Individual Defendants move to dismiss Claims III, V, and VIII, because Plaintiff fails to allege that it had a cognizable property interest in either the CD or its LSA, or that the Individual Defendants deprived Heartland of these interests without due process. *See generally* [#90; #97]. In addition, the Individual Defendants move to dismiss Claims III, V, and VIII, because they are entitled to qualified immunity, as Plaintiff fails to allege that they violated its clearly established constitutional rights. Because this court agrees that the Individual Defendants are entitled to qualified immunity, this court addresses their arguments within the contours of the two-prong qualified immunity inquiry.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). The doctrine applies to government officials in their individual, as opposed to official, capacity, and does not attach to government entities. *See Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005).

Where, as here, the Individual Defendants move to dismiss Heartland's § 1983 claims on the basis of qualified immunity, "the plaintiff must allege sufficient facts that show—when taken

as true—the defendant[s] plausibly violated his constitutional rights, which were clearly established at the time of violation." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (citation omitted). Heartland's SAC need not contain all the necessary factual allegations to sustain a conclusion that Defendants violated clearly established law. *See Robbins*, 519 F.3d at 1249 (recognizing that such a heightened pleading standard is not required) (quoting *Breidenbach v. Bolish*, 126 F.3d 1288, 1293 (10th Cir. 1997)). However, the Complaint must satisfy the minimum pleading requirements, as articulated in *Twombly* and discussed above. *Id.*

### 1. Constitutional Violation

First, the Individual Defendants argue that the SAC fails to allege that they violated Plaintiff's constitutional rights. This court respectfully agrees.

***Substantive Due Process Claims.*** As to Heartland's substantive due process claims, the Individual Defendants contend that Plaintiff does not have a protected property interest in the CD (Claim III) or in its LSA (Claim VIII). *See* [#90 at 10–12; #97 at 3–5]. Specifically, Plaintiff did not have a property interest in the CD given that the CD did not actually transfer to Heartland, and, because the Board retained discretionary authority to approve both a CD and a beneficial use determination as to its LSA, Plaintiff cannot claim a legitimate entitlement to either. [#90 at 10–12; #97 at 4–8]. Further, even if Plaintiff had protected property interests in either, the SAC fails to allege that the Individual Defendants' actions were arbitrary and capricious. [#90 at 14–17; #95 at 10–13]. As before, Plaintiff relies on the doctrine of equitable estoppel in support of its contention that it has a protected property interest in both the CD and its LSA. *See* [#95 at 8–10].

Assuming without deciding that Plaintiff does possess a protected property interest, this court respectfully concludes that the SAC still fails to plead plausible substantive due process

claims against the Individual Defendants. Plaintiff avers that Defendant Kreutzer's actions were arbitrary and irrational, because he disregarded "numerous earlier inconsistent positions from both the CDPHE and CDA," and ignored evidence that Plaintiff had a valid CD. [#95 at 14–15]. Similarly, that Defendants Barbare, Bankoff, and Snapp offered "*no* explanation for their change in position from the earlier approvals that the LSA was properly regulated as a soil amendment under the CDA's authority," and their conduct bore no conceivable rational relationship to the exercise of the State's police power. [*Id.* at 15–16 (emphasis in original)]. For the same reasons discussed *supra*, these allegations fail to rise to the level of conscience shocking.

To start, "not every perceived slight or discourteous act by a public official constitutes a due process violation, and the federal courts are not designed to be a Universal Miss Manners, overseeing the day-to-day conduct of town hall business." *Wyrostek v. Nash*, 984 F. Supp. 2d 22, 27 (D.R.I. 2013). Any failure by Defendant Kreutzer to examine *all* evidence concerning the CD does not, itself, constitute truly outrageous behavior and, as explained, any misinterpretation/misapplication of state law by Defendant Kreutzer is not extremely arbitrary. *See Norton*, 103 F.3d at 932 (explaining that arbitrary does not mean erroneous). The same can be said for Defendant Barbare, Bankoff, and Snapp's actions. Contrary to Plaintiff's assertions that these Defendants provided no explanation for their change in position regarding the LSA, Defendant Barbare's September 8, 2016 email appears to explain that Plaintiff received conditional approval for using its LSA within the boundaries of its CD for a one-year pilot test, but that Heartland would need a beneficial use determination and discharge permit before it could distribute its LSA to third parties. *See* [#90-1 at 1; #64 at ¶ 73]. Heartland alleges, "Barbare's email referenced some 2015 discussions concerning handling of LSA on Heartland's own property, which was a separate issue. Barbare's attempt to conflate the issues was

unjustified, and represented the **first time** ever that CDPHE had taken the position that distribution of LSA to third parties was a regulated activity." [#64 at ¶ 73 (emphasis in original)]. Similarly, the SAC conclusorily alleges that Defendants Bankoff and Snapp also changed their position on LSA without any explanation, and the "change was completely arbitrary." [*Id.* at ¶¶ 86–88]. Whether any explanation (or lack thereof) is incorrect, misguided, or even ill-advised, alone, does not amount to arbitrary, unusual, or even irrational behavior. *See Camuglia*, 448 F.3d at 1222 ("The Due Process Clause is not a guarantee against incorrect or ill-advised government decisions." (internal quotations, brackets, and citations omitted)). Accordingly, this court respectfully concludes that Claims III and VIII fail to plead plausible violations of Heartland's substantive due process rights.

  ***Procedural Due Process.*** Claim V also alleges a procedural due process claim against Defendant Kreutzer, asserting that "Heartland had no opportunity to provide information or input on the issues [addressed in Defendant Kreutzer's November 8, 2016 letter] beforehand, and had no warning that the letters were being prepared." [#64 at ¶ 182]. Heartland continues, "[Defendant] Kreutzer made no effort to investigate the history of the [Board's] and CDPHE's communications with Heartland before writing his letter," and that the CDPHE and the Board "accepted and relied upon his incorrect conclusion that Heartland did not possess a valid CD," without conducting their own analysis into the validity of his opinion. [*Id.* at ¶¶ 183–84]. At oral argument, Heartland vigorously argued that Defendant Kreutzer knew or should have known that the Board would rely on his opinion, and that due process required Defendant Kreutzer to provide some type of process. *See* [#104 at 78:24–79:4, 79:9–20, 80:1–6, 80:7–24, 87:2–21]; *see also* [#95 at 12–13].

Defendant Kreutzer argues that Claim V fails as a matter of law for several reasons. First, Heartland learned of Defendant Kreutzer's letter on or about November 14, 2016, but did not initiate any action for judicial review under Colo. Rev. Stat. § 24–4–106(4) within the requisite thirty-five (35) days. [#90 at 13–14]. Second, that the Board is the only governing body that can conduct hearings on CDs; thus, Defendant Kreutzer could not afford Heartland the process it desired. [#90 at 14; #97 at 9]. Third, Defendant Kreutzer contends that his November 8 letter was not a revocation of Plaintiff's CD, nor was it a Cease and Desist letter, and that Heartland understood that it could still operate the Facility despite the letter. *See* [#97 at 9; #64-1 at 79:15–17, 79:23–80:3, 157:24–158:4].

Again, assuming without deciding that Plaintiff has a protected property interest in the CD, this court concludes that Defendant Kreutzer did not violate Plaintiff's procedural due process rights because he did not deprive Plaintiff of its property. For example, in *Teigen v. Renfrow*, the Tenth Circuit considered a procedural due process claim asserted against various directors of the Colorado Department of Corrections ("CDOC"). 511 F.3d 1072, 1075 (10th Cir. 2007). The plaintiffs alleged that the defendants had a policy (via an email) of blacklisting them from promotions, because they filed administrative grievances against the defendants. *Id.* at 1076–77. The Tenth Circuit held that the plaintiffs had a property interest in continued employment, created under Colorado law. *Id.* at 1079. However, the Tenth Circuit explained, "[the] [p]laintiffs' property interest in their continued employment and employment status, however, cannot form the basis for their due process claims because they have not alleged they were terminated or deprived of their existing employment status as a result of the alleged blacklisting itself . . . [r]ather, . . . [the] [p]laintiffs remained employed by the [C]DOC[.]" *Id.*

The same is true here.[15]  Despite Defendant Kreutzer's letter, Heartland understood that the letter was not a revocation of its CD or a Cease and Desist letter; rather, the letter informed Heartland of the need to apply for a new CD, but that the Facility remained operational.  *See* [#64-1 at 79:15–80:3; #64-14 at 3].

Nevertheless, at oral argument, Heartland argued that Defendant Kreutzer knew the Board would rely on his letter to suspend USR-1704 and that this fact created an obligation on Defendant Kreutzer to provide Heartland adequate process.  *E.g.*, [#104 at 78:24–79:4, 79:9–20]. Though true that the Board relied on Defendant Kreutzer's letter at the December 19 show cause hearing, *the Board* ultimately suspended USR-1704.  Moreover, as discussed *supra*, Heartland had an opportunity to rebut the notion that it did not possess a valid CD at the December 19 show cause hearing, and did so.  *See, e.g.*, [#64-1 at 78:1–82:10].[16]  And, while the better (or at least more courteous) course of action might have led Defendant Kreutzer to include Heartland in discussions prior to the issuance of any letter, Plaintiff points to no authority that requires such action.  Thus, this court respectfully concludes that Heartland fails to allege that Defendant Kreutzer violated its procedural due process rights.

### 2.     Clearly Established

Though this court's conclusion *supra* entitles the Individuals to qualified immunity for lack of a constitutional violation, this court briefly touches on the clearly-established prong as a failure on either prong justifies dismissal on qualified immunity grounds.  *See Pearson*, 555 U.S.

---

[15] Plaintiff's reliance on *Cross Continent* is again misplaced because in that case, the commercial lease was actually revoked without any notice or hearing as required under the lease.  742 F. Supp. 2d at 1189.  Here, Defendant Kreutzer's letter did not revoke the CD.

[16] *See also* [#64-1 at 79:8–80:3 (Heartland's legal representative testifying that he had an opportunity to "talk to David Kreutzer about his opinions" after he issued the letter, and that Defendant Kreutzer informed Heartland that this letter did not require immediate action and that is why Heartland "had that discussion with David Kreutzer.")].

at 236 (holding that a court, within its sound discretion, can consider either prong of the qualified immunity analysis first, and qualified immunity may be appropriate on a failure of either prong). Recently, the Tenth Circuit clarified a plaintiff's pleading burden as to the clearly established prong of a qualified immunity defense raised on a motion to dismiss. The Tenth Circuit explained,

> A constitutional right is clearly established when a Tenth Circuit precedent is on point, making the constitutional violation apparent. This precedent cannot define the right at a high level of generality. Rather, the precedent must be particularized to the facts. But even when such a precedent exists, subsequent Tenth Circuit cases may conflict with or clarify the earlier precedent, rendering the law unclear.
>
> A precedent is often particularized when it involves materially similar facts. But the precedent may be adequately particularized even if the facts differ, for general precedents may clearly establish the law when the defendant's conduct obviously violates the law. Thus, a right is clearly established when a precedent involves materially similar conduct or applies with obvious clarity to the conduct at issue.
>
> By requiring precedents involving materially similar conduct or obvious applicability, we allow personal liability for public officials only when our precedent puts the constitutional violation beyond debate. Thus, qualified immunity protects all officials except those who are plainly incompetent or those who knowingly violate the law.

*Apodaca v. Raemisch*, No. 15-1454, --- F.3d ----, 2017 WL 3138361, at *2–3 (10th Cir. July 25, 2017) (internal brackets, quotations, and citations omitted); *see also Lowe v. Raemisch*, No. 16-1300, --- F.3d ----, 2017 WL 3138609, at *2 (10th Cir. July 25, 2017) (discussing what constitutes clearly established law).

The Individual Defendants argue that, even if Plaintiff had alleged a constitutional violation, they enjoy qualified immunity because there is no Tenth Circuit or Supreme Court opinion that "clearly establishes that under Colorado law, the anaerobic digester wastewater used as a fertilizer/soil amendment cannot be regulated as solid waste," or that "a Certificate of Designation transfers with title to property" under Colorado's zoning laws. [#90 at 19]. While

this court agrees with Plaintiff that the Individual Defendants' reading of the law is too narrow, it respectfully disagrees with Plaintiff that it is sufficient to plead a violation of generalized principles of due process. *See Apodaca*, 2017 WL 3138361, at *2–3. Nor, as explained, does this court find persuasive Plaintiff's attempts to paint the Individual Defendants' conduct as "egregious" to the point that each should have known that their conduct violated clearly established law. *See* [#95 at 18–19]. Ultimately, this court respectfully concludes that Plaintiff fails to plead that the Individual Defendants violated its clearly established constitutional rights and, therefore, respectfully RECOMMENDS that Claims III, V, and VIII be DISMISSED against the Individual Defendants on qualified immunity grounds based on either prong of the analysis.

## CONCLUSION

For the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1)     Defendant Board of County Commissioners of Weld County's Motion to Dismiss the Seconded Amended Complaint and Jury Demand [#73] be **GRANTED IN PART and DENIED IN PART**;

        (a)     Plaintiff's Claim I be **DISMISSED**;

        (b)     Plaintiff's Claim II **REMAIN**;

        (c)     Plaintiff's Claim III be **DISMISSED**;

        (d)     Plaintiff's Claim IV be **DISMISSED**; and

        (e)     Plaintiff's Claim V be **DISMISSED**;

(2)     Defendants David Kreutzer, Heather Barbare, Michael Bankoff, and Donald Snapp's Motion to Dismiss [#90] be **GRANTED**, and that Heartland's claims against these Defendants be **DISMISSED**;[17] and

(3)     Consistent with this Recommendation, this court will issue a concurrent Minute Order addressing the lifting of the stay of discovery and the September 7, 2017 Status Conference, *see* [#94].


DATED: August 30, 2017                          BY THE COURT:

                                                s/ Nina Y. Wang
                                                Nina Y. Wang
                                                United Stated Magistrate Judge

---

[17] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).